No. 22,593.

ESTHER I. McMULLEN, as Administratrix of the Estate of HUGH GALE McMULLEN, Deceased, *Appellee,* v. THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, *Appellant.*

SYLLABUS BY THE COURT.

1. FEDERAL EMPLOYER'S LIABILITY ACT—*Negligence—Death of Brakeman—Killed While in Performance of Duty.* The evidence fairly tends to show that the deceased brakeman was, when injured, engaged in the performance of his duty in attending to the air hose on the train then being made up by the switching crew.

2. SAME—*Negligence Question for Jury.* The record presents a case rightfully submitted to the jury as to the defendant's negligence.

3. SAME—*Certain Evidence Competent in Support of Negligence Charged.* The charge of negligence in kicking certain cars violently and without warning against the deceased, is held to include the transmission of a wrong signal by a member of the switching crew, which signal was the cause of such violent movement.

4. SAME—*Assumption of Risk by Employee.* Under the federal employer's liability act assumption of risk does not depend on a danger so glaring that a person of ordinary prudence would not have encountered

McMullen v. Railway Co.

it, but an employee is not held to have assumed the risk unless the danger is so obvious that an ordinarily prudent person would observe and appreciate it.

5. SAME—*Deceased Brakeman Had Not Assumed the Risk of Defendant's Negligence.* While it was a frequent thing to make up trains by kicking and shoving cars, the switching crew in this instance knew that some member of the train crew would be required to attend to coupling the air hose on the train being made up, and the deceased is not held to have assumed the risk of the sudden and violent propulsion of the cars against him without warning, under the circumstances shown by the record, and which the jury found was done in a negligent manner.

6. SAME—*Instruction—Notice of Deceased's Dangerous Position.* It was not error to refuse an instruction exonerating the defendant if the switching crew had no notice and were ignorant that the deceased was in a position of danger.

7. SAME—*Special Questions.* No material error arose by the refusal to require more definite answers to certain specified questions, or the refusal to set aside the answers to certain others.

Appeal from Harvey district court; FRANK F. PRIGG, judge. Opinion filed July 10, 1920. Affirmed.

*William R. Smith, Owen J. Wood, Alfred A. Scott,* all of Topeka, and *Joseph D. Houston,* of Wichita, for the appellant.

*Ezra Branine,* and *H. W. Hart,* both of Newton, for the appellee.

The opinion of the court was delivered by

WEST, J.:   The plaintiff recovered a judgment for $10,000 for the death of her husband, alleged to have been caused by the negligence of the defendant in kicking certain cars against those connected with the caboose where he was working. The defendant appeals, and in its brief complains of rulings refusing instructions, denying motions to set aside certain findings and for judgment on the special findings, and refusing a new trial.

The deceased was in the employ of the defendant as a brakeman, and on the morning in question was engaged at Emporia in helping make up a west-bound freight train. The way car and six freight cars coupled together were standing on track No. 4, the way car being attached at the east end of the string, and the deceased was at the east end of the way car. Another

part of the train to be made up was propelled against these cars, and in some way the deceased was caught and run over and suffered fatal injuries.

The petition alleged that the death of the deceased was caused by the negligence of the defendant in this: That while he was at the rear or east end of the way car, the defendant, its agents, servants and employees, negligently ran the switch engine with freight cars attached thereto and being shoved at a dangerous rate of speed, and negligently kicked the way car and ran the engine and cars with great force and violence, and without warning, and in a negligent manner against the west portion of the train then made up, thereby negligently causing such portion of the train and way car to be suddenly moved backward and over the body of McMullen.

The train was being made up on a curved track, so that the signals had to be relayed to the engineer, and it is claimed that the trouble arose from the fact that one of the train crew who received a signal to come ahead signalled to the engineer to make a kick, meaning to move his engine rapidly and then suddenly stop so that cars uncoupled from those still attached to the engine would be kicked or propelled violently in the direction in which they had been started.

The defendant filed a general denial, and pleaded contributory negligence and assumption of risk. The jury with their verdict answered several questions and, having been required to retire and answer certain ones more definitely, came in with seventeen findings, one to the effect that the verdict was based on negligence of the switching crew in transmitting signal to the engineer; another that the evidence did not show what the deceased did to protect himself from the time he placed himself in the position where he was struck. As to whether there was anything to prevent McMullen from seeing, hearing and ascertaining that the switching crew were engaged in shifting and moving cars in and about the making up of the train, the answer was:

"McMullen had a right to assume that switching crew knew where he was at that time. No evidence to show that McMullen did not know switching crew were making up train.

.   .   .   .   .   .   .   .   .   .   .   .   .   .

15. If the come-ahead signal given by switchman Moomaw had been correctly transmitted by the switchman Philips to the engineer, and the

McMullen v. Railway Co.

engineer had obeyed the signal, would the brakeman Mr. McMullen have been injured? Ans. No.

. . . . . . . . . . . . . . . .

"17. Is it not a fact that switchman Moomaw gave the come-ahead signal and that the switchman Philips transmitted the kick signal to the engineer? Ans. Yes."

The defendant contends that it was guilty of no negligence towards McMullen. It is argued that his presence at the way car was unknown to any member of the switching crew engaged in making up the train; that the way car had been coupled to the switch engine and kicked a number of times before the accident; that McMullen just before the injury was in the way car and knew what the switching crew were doing; and that he was an experienced brakeman and fully understood the manner in which trains were made up. It seems that the duty he had to perform was to connect the air hose on the cars as they were coupled up by the switching crew, and it is beyond dispute that kicking was a common practice of which he, with his two years' experience, was quite well aware. It was equally well known to the switch crew that it was the duty of some one of the train crew to be on hand to attend to this coupling, although it does not appear that they had any knowledge that McMullen was actually the one at work at this time. It was alleged in the answer that it was the duty of McMullen to see that the air hose on the train was in proper condition before the train started, and to attend to the coupling up of the cars therein.

One of the switchmen testified:

"They couple up the air between each of the cars and open up the angle cock. You have to go in between the cars when that is done. That is done by the brakeman when the train is being made up. That is the general rule. As the cars are put in they step in and couple up the air. That is the custom and practice. Our engine crew knew that fact."

It was testified that after the six cars and caboose were kicked down on track 4, a car was kicked to track 5, as it was desired to run the car on the head end of the train, and it was left on track No. 5 temporarily—

"Then we kicked two more towards 4 track. We gave them a little kick to kick them clear of No. 5. . . . Those two cars did not clear track 5. The head car was pointed into 4 and the hind car of the two stopped so that it fouled 5, so that this car couldn't go into 5 without

cornering it. In other words the west end of those two cars didn't quite clear track 5. The drag was standing a little west of 5 track about half way between. I would imagine there were about 50 or 70 cars between the end of the drag that we had hold of and the west end of the car that stopped. When we kicked them down in there I stepped on the other side to see if the other cars went to clear No. 5 and I saw that they didn't and I lined the switch back for the lead, and I stepped over on the south side and gave them the sign, to come ahead and shove them into the clear. . . . When I gave the come-ahead signal Philips gave the come-ahead signal. The engineer came ahead and shoved down against those two cars. When we coupled into them I gave the sign to come ahead, to come on in. I saw Philips, he gave them a sign to give them a kick. . . . When the high-ball or kick signal was given by Philips the engineer opened her up and gave it a shot. As quick as I seen the high-ball and seen that the engineer was going to kick them, I commenced to stop him, flag him down. I gave a stop sign. . . . After the two cars stopped, and we had come up to them, we intended to shove them in far enough to clear No. 5. . . . The effect of the two cars coming up against the six cars that were standing on track 4 was this, the distance was so short between the string of cars attached to the way car, and the rest that we had hold of after we had coupled in to those, that it hit those cars a pretty hard rap, and it had a tendency to give them a violent jar backwards. I should judge that the caboose moved about four car lengths by reason of that impact. A car length is generally figured about 40 feet. . . . The difference in the movement of those cars by reason of the high-ball or kick signal being given by Philips instead of the slow and easy come-ahead signal, caused them to hit the drag of cars and give them a lurch backwards. . . . If the engineer had only responded to the come-ahead signal that Taylor and I were giving at that time we would not have hit the west end of those standing cars at that time."

The condition of the deceased's body when found showed that he had been dragged for some distance and cinders were ground into the wounds. The engineer of the switching crew testified:

"A. If it was kicked hard enough to move the way car four car lengths, it was an awful hard lick they got. I don't know that it was moved that far.

"Q. Assuming that it did move that far, you would say it got an awful hard lick. A. Yes, sir; if it moved it that far it must have got an awful lick."

This is not a case of a trespasser or track walker, or even of a switchman working where he could be seen by the engineer and those in charge of the train movement. It was the duty of the switching crew to make up the trains, except attending to the air hose, and that was the deceased's duty. A rule of the

company provided that brakemen must be at their trains and ready for duty thirty minutes before leaving time, and earlier if required—

"Brakemen of freight trains will be expected to couple air-hose in making up trains at terminal points, and have train in readiness to test air when engine reaches train. · They will begin invariably at the rear end of train and see that stop-cock in train-pipe at rear of last air car is closed, and all other stop-cocks in train-pipe at end of cars are open; that the hose are all coupled; that the stop-cock in branch-pipe of each car is open; the handle of pressure-retaining valve on each car turned down, and all hand brakes released unless they are needed to hold the cars while making up train."

It was testified that these cars were equipped with automatic air brakes—

"There is a hose between each car and when they are coupled up and the angle cock is open, and they are coupled on to the engine, there is an air pump and the engine pumps air into the reservoir and into the train line, so that when they want to stop and want to set the brakes, the engineer makes a reduction and that squeezes the train line and the reservoir and that has a tendency to push the brake cylinder ahead and set the brake. . . . In the coupling up of the air hose and air line, the first thing for a man to do in connection with that duty on that morning would be to shut the angle cock. . . . He would have something to do with reference to the tail hose. . . . It has always been customary for the rear brakeman to couple up the air hose."

The conductor testified that he said nothing to McMullen about the work to be done that morning—

"He knew what was to be done. All there was left for him to do was to couple up the hose on the train. He would commence at the rear end of the way car then turn the angle cock. . . . He was supposed to commence his duties thirty minutes before the time come to leave. . . . McMullen was supposed to hang up the tail hose on the hook provided for it."

After the injury conductor Tenney examined the rear end of the way car and found the angle cock closed. He did not believe the tail hose was hung up. He thought it was hanging down. He had gotten four cars ahead of the way car in checking the train when the injury occurred. The witness said that, assuming McMullen was hanging up the tail hose or adjusting the angle cock, he would say that he was in the performance of his duty at that time.

Philips, one of the switching crew, testified that when they

gave the kick signal the distance between the ends of the cars they had hold of and the train on the track was about ten or twelve feet. Another brakeman of the train crew testified that he went on duty at 6:30. McMullen was in the way car when he arrived. After the witness left the way car he proceeded to check the train, the same as the conductor did, and while they were checking up the train all that McMullen had to do would be to couple up the air hose. McMullen's first duty to perform in connection with the coupling up of the air line would be to go to the rear end of the way car and couple up the tail hose and turn the angle cock on the rear end of the way car. At the time they arrived at the way car the angle cock would be open and the tail hose down. He examined the rear end of the way car after McMullen was injured. The angle cock was closed. The tail hose was still down. If McMullen was at the rear of the way car closing the angle cock and hanging up the tail hose at the time he was injured, he would then be in the performance of his duty. There would not be any other occasion for his being back there at all, except to close the angle cock and hang the tail hose up.

Counsel for the defendant in their brief say:

"There was no eyewitness to the accident nor was there any testimony as to how it occurred. It may be assumed, however, that very shortly after the conductor and brakeman left the way car, he left the car and closed the angle cock and at that time the cars were kicked in on track 4, and by the impact, while he was between the rails on track 4, and at the rear end of the way car, was knocked down and run over. This assumption is based entirely on the situation appearing after the accident. . . . The duty of the conductor and brakeman of the train crew was to examine the seals and check the cars in the train, and that of McMullen was to close the angle cock, hang up the tail hose, and couple up the air hose on the train. This was usually done after the train was made up and just before or after the road engine was attached to the train. Although, from what he told Dr. Eckdall, it was not the proper time to do so, he thought it had to be done and he would perform that duty while the train was being made up."

From all this testimony and the rules of the company referred to, and the condition of affairs assumed by counsel for defendant, it seems unreasonable to hold that McMullen was not engaged in the performance of his duty when injured, or that he was not located and engaged as the switch crew knew he or some other brakeman ought to be.

While it may not have been the duty of the switch crew to keep a lookout under ordinary circumstances for a member of the train crew attending to the air couplings, the violent collision caused by the wrong signal and its effects were such as to make it a question for the jury whether such operation was negligent or not. (*Saar v. Railway Co.*, 97 Kan. 441, 155 Pac. 954.)

But it is urged that the negligence on which the jury based the verdict was other than that alleged in the petition. We hold, however, the charge that the switch engine and cars were shoved at a dangerous rate of speed and run with great force and violence without warning against the other cars of the train, causing the way car suddenly and violently to move backwards over the body of McMullen, fairly includes the cause of such alleged violence, which was the transmission of the wrong signal. (*Linker v. Railroad Co.*, 82 Kan. 580, 109 Pac. 678.)

It is also urged that the deceased assumed the risk, thereby exonerating the defendant. In *Spinden v. Railway Co.*, 95 Kan. 474, 148 Pac. 747, we held that in an action under the Federal employer's liability act it was error to instruct that the assumption of risk could only be established by showing that its danger was so glaring that a person of ordinary prudence would not have attempted it. In the opinion it was said:

"The employee is not regarded as assuming unknown or unappreciated risks arising from his employer's neglect, unless they are so obvious that an ordinarily prudent person would observe and appreciate them." (p. 476.)

The Federal supreme court, in *Seaboard Air Line v. Horton*, 233 U. S. 492, held that Congress in enacting this legislation based the action upon negligence only, and excluded responsibility of the carrier to its employees for defects not attributable to negligence. Touching risks not naturally incident to the occupation, it was said:

"These the employé is not treated as assuming until he becomes aware of the defect or disrepair and of the risk arising from it, unless defect and risk alike are so obvious that an ordinarily prudent person under the circumstances would have observed and appreciated them." (p. 504.)

The same court, in *Reese v. Phila. & Reading Ry.*, 239 U. S. 463, held that a railroad is bound to exercise under the circumstances the care towards its employees "which the exigency

reasonably demands in furnishing proper roadbed, tracks, and other structures" (syl. ¶ 1), and that failure to exercise this care constituted negligence. In *Ches. & Ohio Ry. v. De Atley*, 241 U. S. 310, the plaintiff was the head brakeman on a fast interstate freight train and was directed by the engineer to go to a telephone at a certain station to ascertain the whereabouts of another train so as to determine whether it was safe to proceed ahead of it. He was unable to understand the operator and so reported to the engineer, then got into the cab and rode until it stopped for coal and water. He was then directed by the engineer to go forward and ascertain the whereabouts of the other train. He at once left the cab and saw the other train approaching. When it reached the platform he attempted to board the engine. He could not accurately judge the speed of it, but it appeared to be going slowly enough for him to board it. But in attempting to do so he fell beneath the wheels and his arm was cut off. He had been employed about six weeks and had made two round trips to get familiar with his duties. He had frequently been called on to leave the train and go forward for signal orders. On this occasion the train was running about 12 miles an hour. The case went to the jury under instructions making the defendant's liability dependent upon whether the engineer, with knowledge of the plaintiff's presence and of his attempt to board, operated the train at such a speed as to make the attempt unusually hazardous. There was a verdict for the plaintiff. The court said:

"It is insisted that the true test is, not whether the employee did, in fact, know the speed of the train and appreciate the danger, but whether he ought to have known and comprehended; whether, in effect, he ought to have anticipated and taken precautions to discover the danger. This is inconsistent with the rule repeatedly laid down and uniformly adhered to by this court. According to our decisions the settled rule is, not that it is the duty of an employee to exercise care to discover extraordinary dangers that may arise from the negligence of the employer or of those for whose conduct the employer is responsible, but that the employee may assume that the employer or his agents have exercised proper care with respect to his safety until notified to the contrary, unless the want of care and the danger arising from it are so obvious that an ordinarily careful person, under the circumstances, would observe and appreciate them." (p. 315.)

It was further stated that the court was unable to concur in the view that there was no question for the jury—

"Whether the risk was an extraordinary risk depended upon whether the speed of the train was greater than plaintiff reasonably might have anticipated; and this rested upon the same considerations that were determinative of the question of the engineer's negligence." (p. 317.)

In *Ches. & Ohio Ry. v. Proffit*, 241 U. S. 462, the plaintiff was head brakeman on a fast interstate freight train comprising about forty cars which had just come into the terminal yards and were about to be taken forward. He got upon the road engine and this was attached to the train, plaintiff making the coupling. Just after this he met the yardmaster, who directed him to cut out three cars at the head end of the train and switch them off on a sidetrack and come back and couple up. The plaintiff went with the engine and crew to take out the three cars and returned to the main track with the engine and one car, coupled the latter to the forward end of the train and was in the act of coupling up the air hose, an operation which required him to step between the rails. While he was in this position a collision took place, caused by the acts of the yard crew, who, unknown to the plaintiff, under orders of the yardmaster were engaged in switching cars at the rear end of the train and drove a cut of twenty-nine cars into the standing cars with undue violence. The impact was such that the plaintiff was knocked down, run over and injured. There was the usual conflict in the testimony about what happened and what the custom of the railroad men was. The trial court instructed that if the jury found the method of making up trains employed by the defendant on this occasion was such as a reasonably prudent man would have adopted in the conduct of his business, then the plaintiff assumed the risks reasonably and usually incident thereto. It refused to give a requested instruction that if the method employed was the usual and ordinary method then the plaintiff assumed all the risks incident thereto. The supreme court said:

"To subject an employee, without warning, to unusual dangers not normally incident to the employment, is itself an act of negligence. And, as has been laid down in repeated decisions of this court, while an employee assumes the risks and dangers ordinarily incident to the employment in which he voluntarily engages, so far as these are not attributable to

the negligence of the employer or of those for whose conduct the employer is responsible, the employee has a right to assume that the employer has exercised proper care with respect to providing a reasonably safe place of work (and this includes care in establishing a reasonably safe system or method of work) and is not to be treated as assuming a risk that is attributable to the employer's negligence until he becomes aware of it, or it is so plainly observable that he must be presumed to have known it. The employee is not obliged to exercise care to discover dangers not ordinarily incident to the employment, but which result from the employer's negligence." (p. 468.)

In *Chicago, R. I. & P. Ry. Co. v. Ward,* 252 U. S. 18, decided by the same court March 1, 1920, it was held—

"In the absence of notice to the contrary, a switchman on a cut of cars to be cut off from the engine had a right to act on the belief that the usual method would be followed and the cars cut off at the proper time, so that he might safely proceed to perform his duty of setting the brake to check the cars.

"A switchman, whose duty it was to set the brake on a cut of cars after it had been cut off from the engine, and who was injured by the sudden checking of the cars, due to the engine foreman's failure to make the disconnection when the speed of the engine was reduced, did not assume the risk, as the injury did not result from an obvious condition of danger, but from the negligent operation of the particular cut of cars." (Syl. ¶¶ 4, 5.)

The trial court instructed that when an employee knows, or in the exercise of reasonable and ordinary care should know, the risk to which he is exposed, he will as a rule be held to have assumed such risk. The supreme court said this charge was not applicable, and quoted from the De Atley decision that it is not the duty of the employee to exercise care to discover extraordinary dangers that may arise from the negligence of the employer or those for whose conduct he is responsible, and that the employee may assume that the employer has exercised proper care for his safety until notified to the contrary, unless the want of care and danger arising from it are so obvious that an ordinarily careful person under the circumstances would observe and appreciate them. The United States circuit court of appeals, second circuit, in *Erie R. Co. v. Linnekogal,* 248 Fed. 389, decided January 16, 1917, held that one acting as brakeman, while assuming the risk of falling from the car on which he was riding, did not assume the risk of being thrown therefrom by the negligent act of the company; "For

such risks are not risks incidental to the employment assumed under the act." (Syl. ¶ 1.)

While, as already observed, it was a frequent thing to make up trains by responding to the kick signal, and the jury were asked whether on this occasion the switching crew were engaged in making up trains by kicking, shoving and shifting cars in about the same manner as defendant's employees had frequently done before, and the answer was: "No, on account of transmitting signals." In reply to another question, No. 7, whether it was customary and necessary to kick and bump cars against each other in order to make up trains, they said: "It was customary, but done in negligent manner at time of deceased's injury."

The trial court is criticised for refusing to instruct that if the members of the switch crew had no notice and were ignorant that the deceased was in a position of danger when the cars were moved against him, they should find for the defendant, and cite *Ivey v. Railroad Co.*, 99 Kan. 613, 162 Pac. 288. But in that case the jury found that no member of the switching crew other than the plaintiff had reasonable cause to think he was in a position of danger when the car in which he was working was moved, while here the switching crew not only ought to have known, but did know, that in the ordinary operation of the train the deceased or some one else would be engaged in coupling the air hose, hence the refusal to give the instruction was not error.

Fault is found with the refusal to require more definite answers to questions Nos. 4, 5 and 13. No. 4 asked if any of the switching crew knew that McMullen was in a position of danger, and the answer was, they knew he was on duty. Under the evidence that they knew he or some other employee ought to be on duty, this answer was not so evasive as to render the ruling materially prejudicial. To question No. 5, as to what McMullen did to protect himself from the time he placed himself where he was struck, the answer was: "Evidence don't show." This was about the only correct answer that could have been given, for there was no evidence on this point. Question No. 13 inquired whether in making up trains the switching crew often kicked and bumped cars as hard and often lighter than they were kicked on this occasion, and the answer

was: "Yes, when signals call for such movements." We see nothing wrong with this answer, which was evidently intended to mean that hard kicks were frequently given when signals therefor were made, but it was not intended by this to find that it was customary to give wrong signals therefor.

Findings Nos. 6, 7, and 9 were sought to be set aside as against the evidence and not supported thereby. No. 6 asked whether or not the switch crew were making up the train "by kicking, shoving, and shifting cars in about the same manner as defendant's employees had frequently done before in defendant's yards?" and the jury said: "No, on account of transmitting signals." We regard this as a direct and fair answer borne out by the evidence. No. 7 has already been given. . We can find in the record no ground for setting aside this finding. No. 9 was an inquiry as to what there was to prevent McMullen from learning that the crew was engaged in shifting and moving cars in making up the train had he taken pains to look and listen:

"Ans. McMullen had a right to assume that switching crew knew where he was at that time. No evidence to show that McMullen did not know switching crew were making up train."

This was not a very direct answer, but we cannot perceive that failure to set it aside worked any material prejudice.

Following the applicable rules which have been laid down by the national courts and which are our guide in cases under the Federal act, we find no material error in the record, and the judgment is affirmed.

Burch, J., concurs in the affirmance of the judgment.