No. 23,150.

CARLOS QUILANTAN, *Appellant*, v. THE UNION PACIFIC RAIL-
ROAD COMPANY and WALKER D. HINES, as Director General
of Railroads, *Appellees*.

SYLLABUS BY THE COURT.

1. NEGLIGENCE—*Injury to Trackman—Assumption of Risk.* The facts
disclosed by the plaintiff's own testimony show that in remaining on
the track until struck by the defendants' engine, he took his chances—
assumed the risk.

2. SAME—*No Actionable Negligence of Defendants Shown.* The record
also shows that the defendants were not guilty of negligence in failing
to warn the plaintiff of the approach of the train which injured him.

3. SAME—*Instructions.* No error is found in the instructions given.

Appeal from Wyandotte district court, division No. 3; WIL-
LIAM H. McCAMISH, judge. Opinion filed May 7, 1921. Af-
firmed.

*Charles E. Thompson,* and *H. F. Gorsuch,* both of Kansas
City, *W. W. McCanles, F. M. Kennard,* and *S. L. Trusty,* all of
Kansas City, Mo., for the appellant.

*R. W. Blair, T. M. Lillard,* and *O. B. Eidson,* all of Topeka,
for the appellees.

The opinion of the court was delivered by

WEST, J.: The plaintiff sued under the Federal employer's
liability act to recover for an injury caused by being struck by
one of the defendants' engines. He recovered, but the court
set the verdict aside and rendered judgment for the defendants.
The plaintiff appeals and assigns as error certain instructions
given, rendering judgment for the defendants on the findings
of fact, and the refusal of a new trial.

He alleged that he was a trackman in the employ of the de-
fendants, the railroad company and the director general, work-
ing upon the railroad tracks at Topeka, cleaning and repairing
them, when one of the defendants' freight trains carelessly,
negligently and without warning to plaintiff was carelessly
run against him, knocking him down and crushing his left leg
so that it was amputated about four inches below the knee;

that when the train was approaching, those operating it gave him no warning of any kind; that they knew or in the exercise of reasonable care should have known that he was working upon the track; and that they negligently failed to inform him that such train would pass along the track and negligently failed to provide means of notifying him thereof when they knew or should have known that in conducting his business he could not do the work required of him and at the same time watch in both directions for the approach of trains. He further alleged that they saw him in a place of danger, or by the exercise of reasonable care should have seen him, and had an opportunity to warn him of their approach in time to avoid injury, but they carelessly failed to stop the train or reduce its speed when they knew, or by the exercise of reasonable care should have known, that if they continued to operate it at the rate it was going, it would strike and injure the plaintiff.

The plaintiff testified that he was fifty-two years old.

"My name is Carlos Quilantan. Was working in Topeka at the time I got hurt. Was cleaning yards and track. There were three tracks where I got hurt. Was north of the tool house. About twenty meters west of the Rock Island crossing. Had been working on the middle track before I got hurt, about a half hour. Moved from the main track to get out of way of the switch engine that was going to stop there. When the switch engine come we were all working around there and the others went to one side and I went to the north side. Had been working at that place about a half hour before I was struck. Switch engine was just to one side of me when I got hurt. Switch engine was standing there making noise, blowing steam out. That was the reason I had not felt the other engine coming. The time I got hurt was working between rails on the north track.

"Q. Which way were you facing? A. Towards the depot. The depot was towards Kansas City.

"Q. You were looking towards Kansas City? A. Yes.

"Q. Now, state to the jury what position you were in at the time you got hurt. A. I was stooping over working when this happened. I didn't know what it was. I was cleaning the inside of the track. The train that hit me did not give any signal or blow any horn, or whistle or ring any bell. If I had heard it I wouldn't have been standing there. The trains always stop before they cross the Rock Island crossing. All trains blow whistles there.

"Q. Just tell the jury what happened to you. A. I was working there and the first I knew was when the train hit me. I just fell over and fainted. I didn't know any more. I just made a jump to the side when I felt it hit me, when I felt bad. I didn't know what happened then, as I fainted."

Quilantan v. Railroad Co.

On cross-examination he testified:

"Had been in railroad work before for one year more.

"Q. You knew that trains were supposed to run over those tracks and would run over them very frequently, didn't you? A. Yes, sir.

"Q. You knew that you section men were supposed to watch out for them and not get in a position where you would not know of their coming, didn't you? A. Yes.

"Q. The yards there at Topeka where you were working are busy yards and a great many engines going back and forth? A. Yes; daily they do, they pass.

"Q. Hearing and sight was good at that time? A. Don't read and write. Was hurt about 2 in the afternoon. Daylight and a clear day. Blowing a little. Was very hot. Switch engine had been there about a half hour. Just standing. Switch engine standing more or less about ten minutes. Had all been working on the middle track up to a few minutes before I was hurt. Was working between the rails with a shovel. Had my face towards the station at Topeka. I had my back to where the train was coming from.

"Q. You understood that you were supposed to watch out for trains coming? Why weren't you keeping a lookout in both directions? A. I was doing it, but at this particular time I straightened up and just as I straightened up I didn't have time.

"Q. You straightened up; you mean you had quit working with your shovel and stood straight? A. Yes; I just straightened up and as I straightened up I didn't know what happened.

"Q. What did you straighten up for? A. Because there is always a suspicion that—except when I straightened up it was too late.

"Q. You were thinking about trains and straightened up with the idea you would look around and watch for them, did you? A. Yes, sir.

"Q. But by the time you straightened up and got ready to look you had been struck? A. I didn't have time then. I didn't know how the engine threw me down then.

"Q. The details of just how it happened you don't remember, do you? A. No, sir, I don't remember more than just I received a blow, what happened. The switch engine was standing there even with me. It was blowing steam up. It was the motive or reason I did not hear.

"Q. You think the noise of this switch engine was the reason you did not hear the train coming from the west, do you? A. Yes, sir."

Other witnesses testified that the plaintiff was standing not between the rails of the track but at one side. The jury found the defendants guilty of negligence consisting in "not sufficient warning and failure to stop the engine."

"Q. 4. Was the plaintiff at the time of his injury an experienced section man? A. Yes.

"Q. 5. Did the plaintiff know, or in the use of ordinary care should he have known, the risks and dangers of being struck by engines passing over the track at the point where he was struck? A. Yes."

They also found that the plaintiff was guilty of contributory negligence and that he was not aware of the approach of the engine in time to get off the track before it struck him. They found that he sustained $8,000 damages, but, on account of his contributory negligence, they returned a verdict for $4,000.

The trial court stated that the findings of the jury amounted to a finding that the plaintiff assumed the ordinary risks of the employment. The court was of the opinion that while he assumed the risk incident to the work, he did not assume the risk of being run down after he was seen in a place of danger and it became apparent that he would not or could not protect himself, and that the evidence did not warrant submitting to the jury the question of last clear chance.

Counsel say in their brief:

"The plaintiff did not assume the risk of being deliberately run down and maimed by an engineer running his engine at two or three miles an hour in broad daylight when the engineer saw the plaintiff stooped over in a position of danger and oblivious of his danger. The plaintiff did not assume the risk of the fireman's negligence, who testified that he saw the plaintiff looking in an opposite direction close to the track. . . . The plaintiff did not assume the negligence of the conductor in charge of the train, who got into the gangway 200 feet away from the plaintiff and who saw the plaintiff in the position of danger and peril and did not instruct the engineer to blow a warning or stop the engine before running over the plaintiff, the conductor having admitted that the plaintiff was looking in another direction at the time. The plaintiff did not assume the risk of the engineer running this engine over the Rock Island crossing without making the usual and customary stop or without sounding the usual and customary warning. The plaintiff did not assume the negligence of his foreman, Henderson, in not warning him of the approach of the engine in time to have avoided being struck, although Henderson testified that it was his usual custom to do so."

Henderson testified that when the switch engine came by him about fifteen minutes before the accident he ordered the plaintiff and another off the track.

The engineer testified that when he first saw him the plaintiff was up near the left rail, probably twenty-five or thirty feet ahead of the engine; and that when he last saw him he was about a foot away standing close to the north rail—just standing there. The fireman testified that the train was going

about five miles an hour and the plaintiff was standing on the track—clear up against it; but that he believed plaintiff was where the engine would clear him without striking him; he believed he was two and one-half or three feet clear of the engine.

We agree with the trial court that there was nothing to justify submitting the question of last clear chance to the jury. *Hackney v. Railway Co.,* 96 Kan. 30, 149 Pac. 421, is cited in support of the contention that an employee does not assume the risk of a coemployee's negligence. That case involved contributory negligence, but no assumption of risk, although that defense was pleaded. *Rockhold v. Railway Co.,* 97 Kan. 715, 156 Pac. 775, is referred to as disposing of the question of the assumption of risk, but that action was under the state act and not under the Federal employer's liability act, a distinction with a very material difference as the defense of assumption of risk was eliminated by chapter 239 of the Laws of 1911. (Gen. Stat. 1915, §§ 8480-8485.)

The Federal rule as to assumption of risk is the one we must follow in this case. (*Roebuck v. Railway Co.,* 99 Kan. 544, 162 Pac. 1163; *Rask v. Railway Co.,* 103 Kan. 440, 173 Pac. 1066.) The Federal rule is to follow the common law. (*Southern Ry. v. Gray,* 241 U. S. 333.) In *Aerkfetz v. Humphreys,* 145 U. S. 418, the employee was familiar with the movements of the cars and of the switch engines and knew that the switch engine was busy making up trains and that cars were liable to be moved along the track where he was working at any time. He placed himself with his face away from the direction from which the cars were to be expected. Abundance of time elapsed between the moment the cars entered upon the track and the moment they struck him. The court said :

"There could have been no thought or expectation on the part of the engineer, or of any other employee, that he, thus at work in a place of danger, would pay no attention to his own safety. . . . They were not bound to assume that any employee, familiar with the manner of doing business, would be wholly indifferent to the going and coming of the cars." (p. 420.)

In *Land v. Railroad Co.,* 95 Kan. 441, 148 Pac. 612, it was held that the railroad company may rightfully assume that its section men, while at work upon the track will look out for the approach of passenger trains at all times, and that ordinarily it

owes no duty to warn them of the approach of the trains save when such employees are found in places of danger, and it becomes apparent that they will not, or cannot, protect themselves. It was there held that the crossing signals are not intended for the section men working upon the track, which disposes of that point in this case. It was also said:

"Railroads must operate their passenger trains and transport their passengers without impeding their progress or imperiling their safety by the necessity of making it a condition precedent to see if its section men, employed for the purpose of keeping the track safe while trains are running over it, are themselves looking out for their approach." (p. 446.)

"Trackmen are employed for the very object of enabling the road to furnish such service and can not require the employer to impair its efficiency by acting as watchman for them." (p. 448.)

In *Waymire v. Railway Co.,* 107 Kan. 90, 190 Pac. 588, it was said:

"But the engineer had the right to assume that the section foreman and his men would continue to look out for their own safety. This was equally true of the rear brakeman. When he left the hand car and climbed upon the train, he had the right to assume that the section men, instead of relying upon his giving signals to the engineer not to back the train, would protect themselves." (p. 98.)

Taking the plaintiff's own story for it, he seems to have waited for the crossing signal which was not intended for his benefit, and on which he had no right to rely, and instead of looking out for the oncoming engine, took his chances, or in other words, assumed the risk of remaining on the track until it was too late. We all know that in railroad yards, and even along the lines of street railways and interurban roads tracks have to be kept in repair by section men and traffic is not to stop on this account. Such repairs are made so that traffic need not stop, but may continue, and the only practical and possible way that such work can be done is for trackmen to watch for the approach of trains and take care of themselves by getting out of the way in time. No one knows this better than trackmen themselves and none better than they how paralyzing it would be to railroad operation for the operators of trains to be required to stop every time a section man was seen on the track until he saw fit in his own leisurely manner to get out of the way. The very fact that other trains and engines may be close by, emitting steam and making noises incident to such instrumentalities makes it the more necessary and sensible to

require those whose very purpose is to keep the track in condition for the unimpeded operation of the trains, to see that this object is not subverted by compelling the cessation of such operation whenever a trackman is seen ahead of an approaching engine.

It seems to be beyond dispute that men working on skyscrapers take a pride in walking on the steel beams at dizzy heights and this leads one to suspect that trackmen take pride sometimes in seeing how long they can remain at work before stepping aside for an oncoming train. While there is nothing to justify that inference in this case or the belief that the plaintiff was actuated by this sort of pride, it does seem perfectly apparent that his unfortunate injury was brought about by his own assumption of risk which was plain to him when he remained upon the track until the fatal moment.

The record does not show that the railroad company's operators were negligent.

Finding no error in the instructions the judgment is affirmed.