No. 23,769.

JESSE R. JAMESON, *Appellee,* v. JOHN BARTON PAYNE, as Agent, etc., *Appellant.*

SYLLABUS BY THE COURT.

1. MASTER AND SERVANT—*Personal Injuries—Proper Party Defendant—Substitution.* Where an action by a railway employee for injuries sustained in railway service is properly brought against the director-general of railroads and federal agent under the transportation act of 1920 and judgment is secured thereon, and where an appeal is taken on behalf of the director-general, the personal name of the director-general is a mere formality; and such appeal will be considered on its merits and not dismissed on the technical ground that the person holding that office has retired and another person has succeeded him in office and no motion for substitution has been formally made and allowed.

2. SAME—*Findings and Judgment Sustained by Evidence.* The evidence examined and held to support the jury's findings of fact and the judgment entered pursuant thereto, and no prejudicial error discerned therein.

Appeal from Cowley district court; OLIVER P. FULLER, judge. Opinion filed July 8, 1922. Affirmed.

*William R. Smith, Owen J. Wood,* and *Alfred A. Scott,* all of Topeka, for the appellant.

*Alfred M. Jackson, Schuyler C. Bloss,* and *George T. McNeish,* all of Winfield, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: This is an appeal from a judgment against a railway company for injuries sustained by a switchman in its service.

While this switchman, Jesse R. Jameson, was climbing up the end of a freight car to set a brake on it, a number of other cars which had been "kicked" too hard crashed into this car and caused him to lose his hold, knocked him against the end of the next car and he

Jameson v. Railway Co.

fell to the ground between them. His foot was caught and crushed, and he was dragged some distance, and seriously and permanently injured. At the time of his injury the switching crew of which plaintiff was a member were engaged in distributing freight cars on five tracks. It was the duty of plaintiff when a car was kicked into one of these tracks to mount the car and set a brake on it, so that it would be stopped before passing a certain point—the east side of a street crossing. His foreman had particularly enjoined him not to let the cars pass that crossing. Plaintiff had set one brake on the car from which he fell, and had been at work elsewhere and on other cars when it occurred to him that he should set another brake on the car in question. In doing so he temporarily got out of touch with his foreman, and as the foreman and enginemen did not know or expect him to be thereabout, they kicked the cars against the one which plaintiff was climbing. Hence the accident and injury to plaintiff.

The jury's general verdict was in favor of plaintiff. Special questions were also answered:

"Q. 1. If you find that the defendant's negligence wholly or partially caused the accident and injury to the plaintiff, state specifically in what such negligence consisted. Ans. Kicked car too hard and neglected to keep in touch with field man.

"Q. 2. Was the plaintiff familiar with the manner and methods of the switching crew in switching and distributing the cars to the several tracks in the yards. Ans. Yes.

"Q. 3. Was it the custom in the yards in Winfield, Kansas, for the field man to keep a watch out for his own safety when cars were being kicked or shunted in upon the several tracks? Ans. Yes, with conjunction of foreman. . . .

"Q. 5. Before beginning to kick or distribute the cars to the several tracks, was the plaintiff ordered by the foreman to set a brake on one car of the string of cars standing on the main track? Ans. Not specifically on main track alone, but to hold cars on each track east of Andrews Street.

"Q. 6. After having complied with the order mentioned in the preceding question and after he had come down from the string of cars and resumed his work as a field man, did the plaintiff again go upon said string of cars standing upon the main track of his own volition and without orders from the foreman? Ans. Yes.

"Q. 7. If you answer the preceding question in the affirmative, then state whether or not the plaintiff notified the foreman or switching crew that he was about to go upon said string of cars a second time. Ans. No, he had no chance.

"Q. 8. Was the plaintiff guilty of any negligence contributing to his injury. Ans. Yes.

"Q. 9. If you answer the next preceding question in the affirmative,. state how much you deduct from the total amount you allow him, because of his own negligence? Ans. We allow plaintiff $10,000.00, but deduct therefrom $2,000.00 for his own negligence."

Judgment being rendered accordingly, the defendant appeals. Plaintiff moves to dismiss on the ground—

"That the appellee commenced suit against John Barton Payne, who was then the legally appointed and qualified agent for railroads under government control; that said suit was tried while the said Payne was agent and on the 21st of March, 1921, judgment was rendered against Payne, as agent, who was at that time the duly acting agent as aforesaid.

"That on the 28th of March, 1921, said Payne resigned as agent, and one James C. Davis was appointed as his successor, and since that time he has been acting as agent; that no appeal was taken until the 16th of July, 1921, and at the time of said appeal Payne was no longer agent as aforesaid, and that the appellant, nor his successor, have ever made any application for a revivor or substitution, and no such revivor or substitution has ever been made, and that more than six months has elapsed since said judgment was rendered."

When congress authorized the president to take over the railroads and to appoint a director-general to unify and operate them for the duration of the war, the first director-general thus appointed ordered that all actions against railroads should be brought against him as director-general; and this order, whether correctly interpreted or not, was construed to require also that the director-general's Christian name and surname *in haec verba* should be included therewith. It need not concern us what purpose could possibly be served by this trivial formality. It was no more than a formality; the essential thing was that the action be against the director-general; and whether the person holding that official position bears the Christian name of Tom, Dick, or Harry, and the surname of Jones, Smith, or Brown is altogether immaterial. We have had occasion to consider this subject at some length in *Helm v. Railway Co.*, 109 Kan. 57, 198 Pac. 190; and while the situation here is not precisely similar, it falls within its general scope. Here the director-general and agent of the federal government was sued, and judgment entered against him—the officer, not the man. Here the director-general—the officer, not the man, appeals. Who the man happens to be is of no consequence in this lawsuit. It is only the prejudicial errors inherent in the judgment, if any, which require our attention. (Civ. Code, § 581.) The motion to dismiss will be

denied; but the name of the present director-general and federal agent under the transportation act of 1920, James C. Davis, will be substituted for that of John Barton Payne.

The errors assigned are argued together, and in substance the defendant's contention is that the defendant's foreman and switch enginemen had no reason to suppose the plaintiff had returned to this car to set another brake. A brake on it had already been set. When last seen by the foreman and switching crew plaintiff was on another car on another track. Plaintiff did not notify his foreman that he was going back to set another brake on this car. He returned there on his own initiative, without an order or signal to do so, and it was unnecessary. Hence, argues the defendant, the plaintiff's injuries were caused by his own negligence, not at all through the defendant's negligence; and as an answer to the jury's finding that the cars were kicked too hard, it says no matter how hard they were kicked, that was not negligence, since the foreman and enginemen did not know, and had no reason to suppose the plaintiff had returned to the track and car in question. Defendant also reminds us that the case is governed by the federal employers' liability law which allows the defense of assumption of risk, and cites the cases of *Land v. Railroad Co.*, 95 Kan. 441, 148 Pac. 612; and *Quilantan v. Railroad Co.*, 109 Kan. 111, 197 Pac. 1095. The jury found (No. 3) that it was the custom of the fieldman (like plaintiff) to keep a watch out for his own safety when cars were being shunted, but added that this was in "conjunction with the foreman." Defendant says there is no evidence to support this latter qualification.

It is undeniable that the plaintiff assumed the usual risks of his employment. Now just what was the risk he assumed when he returned to the car to set another brake? The risk was no more than that the car might be bumped and that consequently he would have to use care not to be jolted off the car. But he surely had the right to assume that at most the car would only receive an ordinary bump. Yet the testimony which the jury believed was that the cars crashed as if "they were tearing each other up." Furthermore, plaintiff testified that the foreman said: "Get back to the main line and set brakes sufficient to hold those cars there." The plaintiff's testimony, too long for reproduction, in part reads:

"[I] was getting up to the brake so he could see me, all at the same time, so that I wouldn't get hurt; after I gets up there and gets hold of the top of

the car I heard them start to make another cut. I just turned around and the headlight hit me in the face; at that time a string of cars come in wild, that is what they call them, and hits this car I am on and knocks me over against the car next to it and down between the track. . . . I think there were three cars on the main line at that time, if I remember right there was; they was rushing me so I can't tell exactly, couldn't get no particular line-up. When I went over to track 5, Cheatam [foreman] was on the north side of the track. I came back to the main line as quick as I could get back. After I got back to the main line I first started to get up on a Pennsylvania coal car. . . . I was going up on the outside on the steps. I set the brake. I was going up on the outside on the steps. . . . Anyway, I got up here and was crossing around the corner, getting on the inside to the brakes, getting up where I could get my lantern where he could see me and protect me. When in that position it wasn't long until I was knocked down between them, that is what happened. The force of the cars caused me to be knocked. I just don't know how forcible it was, but just enough that it knocked all my holds loose from the west car and knocked me clear over to the east car, then back again, then down I fell. I had hold of the car with the usual and ordinary grip I had in doing my duty. . . . I had been on one end of this bunch of cars before. I had set the brakes on that car before, but they was rushing me so I couldn't tell just how tight they were set, or anything about it. Mr. Cheatam didn't specify no one car to set the brakes on. He said to get the brakes and hold them this side of the crossing. He didn't tell me to set one brake on that string. He didn't tell me to set them on one car, nothing of the kind. . . . I couldn't see the switch, I was on the wrong side of the track to see the switch. . . . I just come along and got up on the first in order to cross over to see what was doing. I got up to see what was doing rather than to set brakes, and to set the brakes; that was my duty. . . I was trying to give them notice that I was going on the car when I got knocked off. I had to climb on top of a car to get in sight of the track. . . . I climbed up there so they could see me, that was the main duty, always the main job in the field, to keep in sight, so they won't shove cars down on him and kill him."

This testimony shows the unusual violence of the shunting which caused him to be knocked off the car, and it also fairly disposes of the defendant's contention that the plaintiff was where he had neither order, duty, nor necessity to be. Another significant bit of testimony shows that it was not alone the duty of the plaintiff to look out for himself, but that the foreman also owed a duty in "conjunction" with him as found by the jury, in finding No. 3. This testimony reads:

"The way they learned me with reference to cutting cars when they knew the switchman was in the field, but didn't know where he was in the field, was to not cut off more cars down on top of anybody if they didn't know where they were."

In the light of this evidence, the findings of the jury seem reasonably accurate and just. It cannot be judicially declared that the plaintiff had no business to be where he was when he was injured, nor can it be declared that the unusual violence of the shunting was not negligence (*McMullen v. Railway Co.,* 107 Kan. 274, 281-286, 191 Pac. 306); and' while there was a showing of inconsiderateness or prejudice on-the part of the jury in their first finding No. 9—damages $25,000, deduction for plaintiff's own negligence $17,000; yet, when upon order of court they returned to the jury room to reconsider that finding, their later and more considerate determination of the matter—damages, $10,000, deduction for plaintiff's own negligence $2,000, leaves a result which under all the circumstances this court does not feel at liberty to disturb.

Affirmed.