No. 20,068.

THOMAS I. ROCKHOLD, *Appellee*, v. THE CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY, *Appellant*.

SYLLABUS BY THE COURT.

1. NEGLIGENCE — *Coemployee — Personal Injuries — Evidence.* The evidence examined and held to warrant a finding of negligence on the part of the engineer of a switch engine which struck a brakeman who, in the course of duty, alighted from the tender of a road engine as it was in the act of stopping on a track next to the one which the switch engine was using.

2. SAME—*No Assumption of Risk—Statutes.* The brakeman did not assume the risk of injury occasioned by the negligence of the engineer, because of the provisions of section 1 of chapter 239 of the Laws of 1911, making a railway company liable in damages to an employee for injuries resulting in whole or in part from the negligence of a coemployee.

3. SAME—*Contributory Negligence—Diminution of Damages.* Contributory negligence of the brakeman did not bar recovery of damages from the railway company and could be considered only in diminution of damages. (Laws 1911, ch. 239, § 2.)

4. SAME—*Contributory Negligence—Findings—Verdict Not Excessive.* The evidence examined and held the jury were justified in acquitting the brakeman of great fault. Presumably the amount of negligence attributed to him was small, and in the absence of special findings it can not be said that the jury did not deal justly in the matter of damages, the verdict being for a reasonable sum.

5. SAME — *Negligence of Coemployee — Proximate Cause of Injuries.* When the brakeman alighted he slipped on icy ground, was overbal-

anced by the weight of an appliance which he held in one hand, and in order to regain his balance took a step or two toward the track on which the switch engine was negligently operated. He was struck by the pilot bar of the switch engine and injured. *Held,* the negligence of the engineer of the switch engine was the proximate cause of the injury.

6. SAME—*Injuries—Findings—Damages.* The evidence examined and held that the jury were authorized to conclude that certain physical disabilities of which the brakeman complained were the result of his injury.

Appeal from Wyandotte district court, division No. 3; HUGH J. SMITH, judge. Opinion filed April 8, 1916. Affirmed.

*Paul E. Walker,* and *Luther Burns,* both of Topeka, for the appellant.

*A. B. Crum,* of Lyndon, *C. A. Bowman, J. E. McFadden,* and *O. Q. Claflin, jr.,* all of Kansas City, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one to recover damages for personal injuries inflicted upon the plaintiff, who was an employee of the defendant, by being struck by one of the defendant's switch engines. The plaintiff recovered and the defendant appeals.

The accident occurred in the defendant's yards at Horton, where it maintains, among others, three parallel tracks running east and west which are known in order from south to north as track No. 1, Kansas main line, and Nebraska main line. These tracks are of standard gauge—four feet, eight and one-half inches—are about ten feet apart, and are connected by crossovers. In the eastern portion of the yards is a caboose track extending from the Kansas main line across track No. 1 in a southwesterly direction. In the western portion of the yards and north of the Nebraska main line is a roundhouse. The plaintiff was head brakeman of a freight train which came into the yards from the west on track No. 1. When the train arrived a switch engine was using the caboose track. The road engine was detached from the train, waited for the switch engine to clear the track ahead of it, and then moved forward, took a crossover to the Nebraska main line, and backed toward the roundhouse, which was its destination. The way car of

the train was left at the rear of the train in the western part of the yards. On the way to Horton one of the cars toward the front of the train had a hot box which was cooled by an appliance called a hot-box cooler, and which railroad men call a "Keeley." The proper place for the cooler when not in use was in the way car. It was the plaintiff's duty to go with his engine to the roundhouse. On the way to the roundhouse the way car would be passed, and the plaintiff, standing on a step on the southwest corner of the tender of his engine and holding to a grab iron with his right hand, carried the cooler in his left hand. After clearing the track in front of the road engine the switch engine, by use of crossovers, passed westward to the middle track to pick up a caboose. As the road engine, backing westward on the north track, passed this caboose the switch engine was backing toward the east to couple with the caboose. The road engine proceeded westward at a rate of probably fifteen miles per hour. When within seven or eight car lengths of the way car the engineer of the road engine gave several blasts of the whistle, slowed down, and stopped opposite the way car, which was only about twenty-five feet away, toward the south. The blasts of the whistle were given to call the rear brakeman from the way car to take the hot-box cooler. When the road engine was in the act of stopping the plaintiff let go of the grab iron on the tender and stepped to the ground. The ground was slippery because of ice, the plaintiff slipped, was overbalanced by the weight of the cooler, and took a "couple of steps" in a southwesterly direction to regain his balance. These movements carried him toward but not upon the middle track and he was struck by the pilot bar of the switch engine, which had followed up the road engine and was moving at a rate of speed variously estimated at from ten or twelve to twenty or twenty-five miles per hour. The plaintiff was struck in the back above the left hip, was knocked about twenty feet, was rendered unconscious and remained unconscious for five hours after being taken to a hospital. He testified that he did not realize what had happened until the next day. The jury returned a verdict in his favor for $3000.

The principal contentions of the defendant are that the engineer of the switch engine was not guilty of negligence, that the plaintiff assumed the risk of being injured as he was, that

the plaintiff was guilty of contributory negligence, that the proximate cause of the plaintiff's injury was an independent, intervening fact—slipping and becoming overbalanced—and that the verdict was improperly arrived at and was excessive.

The court is of the opinion there was sufficient evidence of negligence to carry the case to the jury. The road engine stopped to deliver the hot-box cooler approximately 1120 feet west of the point at which it passed the switch engine. While the road engine was going that distance at a rate of fifteen miles per hour and was slowing down to a stop, the switch engine backed several feet to the caboose, coupled to it, started up and overtook the road engine. While there was evidence that the bell on the switch engine was ringing, the plaintiff heard no bell and the engineer of the road engine heard no bell. The whistle of the switch engine was not sounded. The clear space between the tender of the road engine and the pilot bar of the switch engine was approximately five feet. The plaintiff's body and the cooler in his left hand reduced this space. The blasts of the road engine whistle were given as a signal to the rear brakeman and the purpose of signaling him was to have him come and get the cooler. The rear brakeman, who was inside the way car when the signal was given, understood the signal, understood it was given for him, and went out of the way car to get the cooler. A rule required the engineer of the switch engine to run with his engine under control, that is, to be able to stop within the distance the track was seen to be clear of obstruction. The engineer of the switch engine plainly saw the plaintiff's position on the tender of the road engine all the way to the place where the plaintiff alighted, observed that the plaintiff's back was toward him, saw that he had the cooler in his hand, knew where the cooler was carried on the freight train, and knew that its place when not in use was in the way car. The engineer of the switch engine heard the signal to the rear brakeman, observed the fact when the road engine commenced to slow down, and observed the fact that he was gaining on the road engine. The speed of the switch engine was not slackened and its engineer saw the plaintiff step to the ground opposite the way car with the cooler in his hand when within eighteen or twenty feet of him, but it was then too late to avoid a collision. The engineer of the switch

Rockhold v. Railway Co.

engine testified he was running at a speed of only eight or ten miles per hour, that the signal he heard was not for anything in particular, that he had no idea of what the road engine was slowing down for—might have been for something wrong with the engine—and that he was not thinking about the plaintiff getting off. He testified further as follows:

"Q. You knew that if Rockhold got off of that engine and started across the track with that Keeley, that your engine would hit him? A. Not necessarily; if he staid within the 6 or 7 feet there is between the two tracks, I could n't hit him and he could n't be hit.

"Q. You did n't think he was going to take that Keeley to the roundhouse? A. They do do it."

Very likely this kind of testimony did not help the defendant's case, and the jury were warranted in believing that the engineer of the switch engine understood the situation perfectly, knew the cooler was to be left at the way car, knew that the road engine was stopping opposite the way car and several hundred feet from its destination for that purpose, and knew that the plaintiff, whose face was toward the west, would drop off the tender to icy ground with the cooler in his hand in the very narrow space between the tracks. If the jury so believed, it was a fair question whether or not the engineer of the switch engine should have sounded the whistle when he saw he was overtaking the plaintiff, and should have had his engine under control, regarding the plaintiff, under all the circumstances stated, as a very probable if not a certain obstruction to the switch engine's progress.

The defense of assumption of risk was eliminated by chapter 239 of the Laws of 1911, which contains the following provision:

"That every company, corporation, receiver or other person operating any railroad in this state shall be liable in damages to any person suffering injury while he is employed by such carrier operating such railroad . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents or employees of such carrier." (§ 1.)

The provision quoted is in effect a continuation of a statute originating in 1874 and given different forms in 1903, in 1905, and in 1907. (Laws 1874, ch. 93; Laws 1903, ch. 393; Laws 1905, ch. 341; Laws 1907, ch. 281.) In the case of *Railway Co.*

*v. Green*, 75 Kan. 504, 89 Pac. 1042, the statute in the form given it by the act of 1903 was interpreted. It was decided that the plaintiff did not assume the risk of injury occasioned by the negligence of a coemployee, and that it would nullify the statute to hold otherwise.

Contributory negligence of the plaintiff did not constitute a bar to the recovery of damages, and could be considered only in diminution of damages. (Laws 1911, ch. 239, § 2.) The jury were justified in relieving the plaintiff of great fault, and presumably the amount of negligence attributed to him was small. The plaintiff was in the discharge of duty in riding where he did and in alighting when he did. He testified he did not know the caboose was to be brought westward by the switch engine on the middle track, and did not expect the switch engine to come up to the vicinity of the way car on that track. When the road engine commenced to slow down he looked back over his left shoulder to see that there was nothing on the middle track. It was his duty to look and he did look, because, as he said, it is natural for a man who works in the yards to do so. Looking over his left shoulder he could see toward the east six or seven car lengths (240 to 280 feet), and he did not see the switch engine. He heard no bell, heard no whistle and heard no noise of a moving train until he had released his hold of the grab iron and his feet were in the act of striking the ground. From sounds made by the switch engine on the rails and the exhaust he could then tell that the engine was coming at a rapid rate of speed. The fault of the plaintiff lay in not looking over his right shoulder or in not looking again just before he alighted. Had he done either of these things he could have seen the switch engine. However, under all the circumstances stated, he took a fair measure of precaution for his safety, and the amount of his recovery should not have been greatly diminished because he did not take measures to assure himself beyond all doubt. There were no special findings, and it can not be said as a matter of law that the jury did not deal justly with the subject.

The defendant's negligence was clearly the proximate cause of the injury. The two causes contributing to the plaintiff's injury were not distinct and independent of each other (*Railway Co. v. Columbia*, 65 Kan. 390, 69 Pac. 338), but were re-

lated to each other in their operation (*Mosier v. Butler County*, 82 Kan. 708, 109 Pac. 162). The defendant's negligence was proximate in point of time because the negligently managed engine struck the plaintiff after he became overbalanced, and was proximate in causal relation because without it becoming overbalanced would have been without injurious consequence. The subject is sufficiently covered by two decisions of this court in which accidental slipping of the plaintiff, combined with negligence of the defendant, produced injury—*City of Atchison v. King*, 9 Kan. 550, and *Barnett v. Cement Co.*, 91 Kan. 719, 139 Pac. 484.

The plaintiff testified that after he was injured he suffered from impaired eyesight, impaired hearing, and an impediment in his speech. He further testified that he had lost from thirty-two to thirty-five pounds in weight, that he suffered from weakness and dizziness, suffered continually from pains in his back and in his head, that he was very nervous, especially when he worked hard, suffered from lack of sleep and had lapses of memory, and that because of these physical conditions, none of which existed before the injury, he was incapacitated to perform the only kind of labor he was fitted to perform. The plaintiff was injured on December 29, 1913. He was taken to the private hospital of Dr. Reynolds, in Horton, where he remained one week. No bones were broken or dislocated and the doctor said he found no contusions on the defendant's body. There were abrasions on the bridge of the nose, the right eyebrow and right cheek. The doctor said that the plaintiff's stunned and unconscious condition was temporary only, that there was nothing to indicate permanent injury, and that when he left the hospital "he was all right in every way." There was a dressing still on his face and the cinder stains where cinders had been ground into his face were so deep as to be permanent. Another doctor, Doctor Nichols, was called on January 6, 1914. He found the plaintiff's head bandaged and treated the plaintiff several times at the plaintiff's home and then at the doctor's office. There is no evidence abstracted that this doctor made any examination of the plaintiff whatever except with respect to the injuries to his face, of which the plaintiff was then complaining. The plaintiff's eyes were tested some months before he was injured and again in February,

1914.    The oculists testified that the defect in the plaintiff's vision was due to astigmatism.   One of the oculists gave it as his opinion that the plaintiff's stammering did not result from his injury.   There was proof that stammering results from a nerve lesion destroying coördination between muscles of the throat and muscles of the tongue.   None of the four professional witnesses referred to testified that the plaintiff had difficulty with his speech when he was examined or treated.   Other proof showed that the plaintiff had no impediment in his speech before he was injured.   The defendant argues that the jury arbitrarily disregarded the medical testimony and rendered an excessive verdict for physical disability which the jury traced to the plaintiff's injury without any evidence whatever. Very clearly this is not the case.   It is a matter of common knowledge, and there was no proof to the contrary, that all the consequences of such a violent concussion as the plaintiff indisputably received may not develop within a week, the time the plaintiff was in Dr. Reynolds' hospital.   The jury had the right to discount Dr. Reynolds' optimistic opinion that when the plaintiff left the hospital he was "all right in every way." The opinion of Dr. Nichols, who did nothing but examine the plaintiff's face, that the plaintiff was not permanently injured was valueless.   Leaving defect of vision out of account, the plaintiff's physical condition was attributable to nerve lesions, that is, nerve injuries.   His disabilities did not exist before the switch engine struck him, they followed that occurrence, and the jury had the right to believe they were consequences of that occurrence.   The sum allowed as damages was not excessive.

The judgment of the district court is affirmed.