No. 29,472.

CORA RYAN, Administratrix of the Estate of Earl A. Ryan, Deceased, *Appellee*, v. THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, *Appellant.*

(293 Pac. 763.)

Opinion filed December 6, 1930.

*William R. Smith, Owen J. Wood, Alfred A. Scott, Alfred G. Armstrong, C. J. Putt,* all of Topeka, and *K. M. Geddes,* of El Dorado, for the appellant.

*Charles Stephens, F. E. Dresia, C. E. Rumery, C. R. Stauffacher,* all of Columbus, and *Charles W. Steiger,* of El Dorado, for the appellee.

The opinion of the court was delivered by

HUTCHISON, J.: This is an action under the federal employers' liability act by the administratrix of Earl A. Ryan, deceased, to recover from the Atchison, Topeka & Santa Fe Railway Company damages for herself and her minor children on account of the death of her husband, Earl A. Ryan, alleged to have been caused by the

negligence of the defendant railway, its agents, servants and employees, at Wellington, Kan., on March 3, 1927. She recovered a judgment for $10,000, and defendant appeals.

The petition alleges that the deceased, an engineer in the employ of the defendant company, was walking from the roundhouse office in the yards at Wellington toward switch engine No. 908, on an east-and-west track, headed eastward for the purpose of serving defendant as engineer thereon. That in going eastward toward his engine, in order to avoid walking in a pool of water and oil lying between that track and another east-and-west track about fifteen feet south thereof, he walked along the ties just north of the north rail of the south track looking toward his engine on the north track, which was blowing off steam and making a great noise, and he was struck by an east-bound engine, No. 816, on the south track, by the carelessness and negligence of the defendant and its employees, particularly the hostler, Holdaway, and the hostler helper, Zavala. The specific acts of negligence which caused or contributed toward causing the death of the deceased and of which the plaintiff complains are as follows:

"(a) The carelessness and negligence of defendant and its said engine hostler, C. S. Holdaway, under all the facts and surrounding circumstances, in sitting on the engineer's seat, where he could not see ahead of his engine, instead of standing, which would have enabled him to see said Ryan and stop his engine before striking said Ryan as he could and should have done.

"(b) The carelessness and negligence of defendant and said Holdaway, under all the facts and surrounding circumstances, in running said engine No. 816 faster than six miles per hour.

"(c) The carelessness and negligence of defendant and its employee, referred to herein as a Mexican man, in failing to keep a proper lookout ahead and in giving no stop sign to said Holdaway, and in failing to turn the angle cock at the front end, and thereby bring the engine to a stop within three or four feet and before it struck said Ryan."

The answer of the defendant consisted of a general denial and allegations of contributory negligence and assumption of risk because he, as an employee, and the company were at the time engaged in interstate commerce.

The evidence upon the trial showed that on March 3, 1927, the date of the injury, Ryan was in the employ of the defendant company as a switch engineer in its yards at Wellington, Kan., and had been employed in that capacity at that place for about ten years. He was returning for duty at 3:30 p. m. to take charge of engine No. 908, then standing on the north track in the yards, which engine

was undergoing some repairs by two machinists, the boilermaker foreman and the engine inspector, before being turned over to Ryan for use. He was walking east a part of the distance on ends of the ties extending north of the north rail of the south track, apparently to avoid going through some water and oil near the water crane between these two tracks. The water crane was 174 feet east of the turntable, and the point of the injury was about 253 feet east of the turntable. The distance between the inner rails of these two east- and west-bound tracks was about 12 feet. The point at which he was struck by engine No. 816 on the south track was almost opposite his engine No. 908 on the north track, and there was nothing to obstruct his view of the approaching engine.

The only eyewitnesses to the accident were the two machinists at the engine No. 908 and a Mexican, named Zavala, who was a hostler helper riding on the footboard on the front of engine No. 816. The hostler, or engineer, on the engine No. 816, being in his seat on the south side of the cab, did not see anything prior to the injury. Engine No. 908 had the exhaust open to reduce steam and was making a loud noise. The two men inspecting engine No. 908 saw Ryan in danger of being struck by the approaching engine No. 816 when he was on the ends of the ties just north of the north rail of the south track, although they differ as to his movements in reaching that dangerous position. One said he went across from the cab of engine No. 908 and the other said he had come east a few steps on the ends of the ties outside of the north rail. They both said they called to him. The man in the cab of engine No. 908 said he jerked his head when he called and looked at the top of No. 908 and stepped over on the track when the engine No. 816 was about four feet away from him, and he didn't have time to do anything but yell at him.

The other machinist, the inspector, was on the ground around engine No. 908 and saw Ryan some little distance away coming east down by the water crane. Then he saw him again walking on the end of the ties north of the north rail a step or two, maybe three or four small steps. The witness yelled at him before he stepped over the north rail. Told him to look out for No. 816. He looked up at the steam cock and stepped inside the rail and then made another step south.

The Mexican who was riding on the footboard of engine No. 816 at the time of the accident had been working six years in the yards at

Wellington and had worked nine years in the roundhouse there. He said when he first saw Ryan he was just entering the rails. He was not walking outside the rails but passing across the track. He entered the rails about six feet away from him. He holloed at him, "Watch out," two or three times and tried to push him out of the way. He grabbed the engine with one hand and tried to push him off the track. He didn't apply the emergency brake or signal the engineer because he didn't have time.

The engineer on engine No. 816 said he had blown the whistle when he left the turntable and blew it again somewhere between there and the water crane. The bell was ringing all the time and was ringing at the time of the accident.

The engine was in good repair. It had an emergency brake lever in the cab. It also had an angle cock on the front near where the Mexican stood. If the Mexican had pulled it the engine would have stopped in a few feet, not more than five or six. The engine was running at a speed of between five and ten miles an hour; nothing in the movement unusual.

The injury occurred on the south rail. The first he knew of it was when he saw something flying in the air.

The engine inspector gave it as his opinion that if engine No. 816 was running between six and eight miles an hour, the opening of the angle cock would have stopped the engine within a distance between eighteen inches and two feet.

In addition to the general verdict, the jury answered twenty-nine special questions as follows:

"Q. 1. Was the defendant company guilty of any negligence? A. Yes.

"Q. 2. If you answer the last question 'yes,' then state fully and completely in your own language of just what such negligence consisted, and what person or persons were guilty of such negligence. A. The Mexican was negligent in not applying the angle cock and signaling to Holdaway to stop engine No. 816.

"Q. 3. Was Earl A. Ryan guilty of contributory negligence? A. Yes.

"Q. 4. If you answer the last question 'yes,' then in your own words state fully and completely of what you find said negligence consisted. A. Being on the same track that engine No. 816 was moving on.

"Q. 5. Did the deceased, Ryan, walk in an easterly direction on the ends of the ties just north of the north rail of the south track? A. Yes.

"Q. 6. If you answer the last question 'yes,' then state how far he walked on the ends of said ties before he stepped over between the rails. A. Eighteen to twenty feet.

"Q. 7. How fast was engine No. 816 traveling at the time of and just shortly before it struck the deceased, Ryan? A. In our judgment, six to ten miles per hour.

"Q. 8. When the deceased first came near enough to the south track to be hit or run over by an engine using that track, how far to the west of him was engine No. 816? A. About seventy feet.

"Q. 9. How fast was engine No. 816 traveling at that time? A. six to ten miles per hour.

"Q. 10. After the deceased first came near enough to the south track to be hit or run over by an engine using that track, did he later get far enough away from said south track that an engine using it would not have hit him? A. No.

"Q. 11. If you answer the last question 'yes,' then state how far it was from the place where Ryan was hit to the place that he returned near enough to the south track to be hit by an engine using said south track. A. ————.

"Q. 12. Did the Mexican see Ryan before the engine hit him? A. Yes.

"Q. 13. After Ryan placed himself in a position of danger could the Mexican, by the use of reasonable and ordinary care and caution, have seen Ryan soon enough to have stopped the engine and avoided injury to Ryan? A. Yes.

"Q. 14. For how long continuously just before Ryan was struck was he in a position of danger? A. He was not out of danger as long as he was on the track.

"Q. 15. If the Mexican had used the angle cock, how far would the engine have traveled from the time he started to use it until the engine came to a standstill? A. Eighteen inches to two feet.

"Q. 16. If you find that the Mexican saw Ryan before the engine hit him, then state where Ryan was when the Mexican first saw him. A. When he stepped between the rails.

"Q. 17. Was there anything unusual in connection with the running of engine No. 816 eastward on the south track or in the manner in which said engine was operated? A. No.

"Q. 18. If you answer the last question 'yes,' then state what said unusual things consisted of. A. ————.

"Q. 19. How long had Earl A. Ryan, the deceased, been employed as a switch engineer in the defendant's yards at Wellington, Kan., when he was struck and killed by switch engine No. 816? A. About ten years.

"Q. 20. State fully and specifically what Ryan was doing in the line of his duty when struck and killed in the yards at Wellington. A. On his way to take charge of his engine to go to work.

"Q. 21. If you find for the plaintiff, state fully what act or acts, omission or omissions of duty on the part of the defendant or any of its employees constituted the negligence which caused or contributed to the death of Earl Ryan. A. Failure of the crew to use reasonable care and caution and to use such things as were proper to stop engine No. 816 before it hit Ryan.

"Q. 22. Had the plaintiff's deceased, Earl Ryan, carefully looked in the direction from which the switch engine 816 came before stepping on the track upon which it was traveling, could he have seen the approaching switch engine? A. Yes. ·

"Q. 23. If you find for the plaintiff in this action, state specifically what agent, employee, or agents or employees negligently caused the injury and death of Earl Ryan. A. The crew of engine No. 816.

"Q. 24. If you find for the plaintiff, state fully and specifically what the agent or employee or agents or employees and each of them mentioned in the next preceding question did or omitted to do, that caused the injury to and death of Earl Ryan. A. Failure of the hostler helper to see Ryan and to use the angle cock to stop the engine or to signal Holdaway to stop engine 816.

"Q. 25. In what distance, as it approached the point of collision, could switch engine 816 have been stopped? A. About two feet.

"Q. 26. If you find that deceased, Earl Ryan, was guilty of negligence contributing to his injury and death, state how much you diminish plaintiff's damage by reason of such contributory negligence. A. $10,000.

"Q. 27. At what rate of speed did switch engine 816 approach the point of collision? A. Six to ten miles per hour.

"Q. 28. How far from Engineer Ryan was switch engine 816 when he stepped between the rails in front of it? A. Six to eight feet.

"Q. 29. If you find Ryan was guilty of contributory negligence, then answer these questions:

"a. How much do you find would be due plaintiff in the absence of contributory negligence on the part of Earl Ryan, deceased? A. $20,000.

"b. How much do you deduct from above on account of contributory negligence of Earl Ryan? A. $10,000.

"c. How much do you fix as the amount of plaintiff's verdict after making deductions on account of contributory negligence of Earl Ryan, deceased? A. $10,000."

The defendant moved to set aside the answer to certain of the questions; also moved for judgment on the answers to the special questions notwithstanding the general verdict. Both motions were overruled as well as that for a new trial, and judgment was rendered for plaintiff on the general verdict.

The answers to special questions 1, 2, 12, 13, 15, 16, 21, 23, 24 and 28 have to do with the finding of negligence on the part of the defendant, and in a general way these answers are summarized in the answers given by the jury to question 24, where it finds that the negligence of the defendant, which caused the injury, consisted in the "Failure of the hostler helper to see Ryan and to use the angle cock to stop the engine or to signal Holdaway to stop engine 816."

This neglect so found consists of the failure on the part of the Mexican, who was the hostler helper, to do three things, viz., (1) to see Ryan, (2) to use the angle cock to stop the engine, and (3) to signal Holdaway, the engineer, to stop engine No. 816.

First, was the Mexican negligent in not seeing Ryan? The jury had already found that he did not see him until he was stepping between the rails, when he was only about six to eight feet in front

of the engine, and that he, by the use of reasonable diligence and ordinary care and caution, could have seen him sooner and soon enough to have stopped the engine.

In determining whether an act or omission of an employee is negligence, we must keep in mind two very important distinctions: first, that under the federal employers' liability act the employee assumes the usual and ordinary risks and hazards incident to the employment; and, second, that the same duty does not devolve upon the company and its employees toward one acquainted with the yards and accustomed to the ordinary movements therein as toward a passenger or stranger or toward a child. The deceased in this case was not only accustomed to the yards, having worked in them for ten years, but his business was to run and move switch engines just as this engine was being moved.

Under the federal employers' liability act it has never been the duty of the employer to place an employee on the lookout to observe and warn other employees of approaching danger.

"Employees of a railroad company are presumed to contract with reference to the hazards incident to the service. It is not the duty of such a company to place an employee on the lookout to warn others of approaching danger. It is their duty, without warning, to observe due care, and this is a part of their undertaking, and any omission is at their peril." (2 Bailey on Personal Injuries Relating to Master and Servant, § 2727.)

In a case in the United States supreme court, prosecuted under this act, where the case also involved a Missouri statute requiring the engineer to stop his train before crossing the track of another railroad, it was held that the failure of the fireman to have been more vigilant and on the lookout for the danger could not be imputed to the defendant company.

"Where a state statute makes it the duty of a locomotive engineer to stop his train within a certain distance of a crossing of another railroad, and positively to ascertain that the way is clear and that the train can safely resume its course, before proceeding to pass the crossing, the duty is a personal one which cannot be devolved by custom upon the fireman; and the negligence of the engineer in failing to comply with the duty is a defense to an action for his resulting death, brought by his administratrix under the federal employers' liability act, notwithstanding a possibility that the injury might have been avoided if the fireman had been more vigilant." (*Frese v. C., B. & Q. R. R.*, 263 U. S. 1, syl.)

The decision in the case just cited was made the basis of a later decision by the same court in which the syllabus is as follows:

"Where a railway collision, killing an engineer, was directly due to neglect of his personal duty not to move his train forward without positively ascertaining that another train had passed, the possibility that the accident might have been prevented but for contributory negligence of other members of the crew in not performing the lookout duty devolving also upon them, will not sustain an action by his representative against the carrier under the federal employers' liability act." (*Davis v. Kennedy,* 266 U. S. 147, syl.)

Both parties cite *Toledo, St. L. & W. R. R. v. Allen,* 276 U. S. 165, where a car checker in a switching yard was struck by a car shunted down the next track and where the plaintiff plead that the employees in charge of the engine and cars "saw, or by the exercise of ordinary care could have seen, plaintiff between said tracks, and in a position of peril and oblivious thereof in time thereafter, by the exercise of ordinary care, with the means and appliances at hand, to have either held said cars stationary, or after having started said cars, stopped them, or slackened the speed thereof in time . . . to have avoided striking and injuring plaintiff; but that said . . . employees failed and neglected so to do." (p. 172.) The court held that the defendant was not in duty bound to give warning by ringing the bell or otherwise; plaintiff had assumed the ordinary risk of his employment. Appellee calls special attention to two phrases in the following closing paragraph of the opinion as supporting the contention that it is a duty to be on the lookout, but those expressions were used either as actual or substantial quotations from the allegations of the petition in the case and when considered with other parts of the opinion cannot require anything beyond a knowledge of the peril rather than a negligent failure to discover such situation.

"There is nothing to sustain a finding that plaintiff was in any danger other than such as was usually incident to his employment or that any member of the crew knew or had any reason to believe that he was oblivious of the situation. *Illinois Central Railroad Co. v. Ackerman,* 144 Fed. 959, 962. In the absence of knowledge on their part that he was in a place where he was liable to be struck and oblivious of that danger, they were not required to vary the switching practice customarily followed in that yard or to warn or to take other steps to protect him. There is no evidence to sustain the allegation that the other employees saw, or negligently failed to discover, plaintiff in a 'position of peril and oblivious thereof.' There was no foundation for a finding in favor of the plaintiff on that issue." (p. 173.)

The recent case of *Caples v. Atchison, T. & S. F. Rly. Co.,* 129 Kan. 341, 283 Pac. 53, cites approvingly the above cases and many others in deciding that under this act the employee assumes the

ordinary risks incident to his employment, and it is not incumbent on other employees of the company to be on the lookout for unobserving or careless employees who might undertake to cross a track in front of moving cars.

"The foreman who was directing the switching movement had a right to expect that other employees would look out for their own safety in crossing tracks upon which cars were being moved. It was not incumbent on him to be on the lookout for unobserving or careless employees who might undertake to cross a track in front of moving cars." (p. 346.)

Another case referred to in the Kansas case just cited is *Aerkfetz v. Humphreys,* 145 U. S. 418, where the concluding paragraph of the opinion, written by Justice Brewer, is as follows:

"The person in direct charge had a right to act on the belief that the various employees in the yard, familiar with the continuously recurring movement of the cars, would take reasonable precaution against their approach. The engine was moving slowly, so slowly that any ordinary attention on the part of the plaintiff to that which he knew was a part of the constant business of the yard would have made him aware of the approach of the cars, and enabled him to step one side as they moved along the track. It cannot be that, under these circumstances, the defendants were compelled to send some man in front of the cars for the mere sake of giving notice to employees who had all the time knowledge of what was to be expected." (p. 420.)

The Caples case, *supra,* is absolutely in point in the case at bar and the following conclusions therein reached are pertinent here:

"An experienced employee, familiar with the yard and with the continuous operation of switching cars therein without 'lights or lookouts on the ends of cars, is required to take precautions for his own safety and has no right to expect the protection of the railroad company that should be exercised towards passengers or others who may have come on their premises for the transaction of business.

"Familiar as the car checker was with the yard and the switching of cars there in the customary way, he had no right to expect that there would be lights or lookouts on the switching cars or that other warnings of approach would be given.

"Those in charge of the switching operation had a right to believe that the car checker, as well as other employees with the knowledge of the yard and the switching of cars therein, would take precautions for their own safety in the ordinary switching operations and would not rely on warnings to be given by those in charge of the switching movements.

"The railroad company cannot be held liable for injuries sustained in the yards in the absence of negligence, and under the evidence it rested under no duty or obligation to give the car checker warning of the ordinary switching of cars done in the customary way." (Syl. ¶¶ 2, 3, 4, 5.)

The case of *Rockhold v. Railway Co.,* 97 Kan. 715, 156 Pac. 775,

is cited by appellee, but the distinction existing between that case and the one at bar is in the fact that it was not brought under the federal employers' liability act.

We have no hesitancy in concluding that the failure on the part of the Mexican to see Ryan was not negligence on his part or on the part of his employer.

The second and third finding of negligence on the part of the Mexican, and consequently on the part of the defendant company, was in his failure to use the angle cock to stop the engine and to signal Holdaway, the engineer, to stop No. 816. Much that has been said heretofore as to the facts here involved apply with equal force to these two features of negligence, and also much of the law cited about the assumption of risk. The effect of this finding is that instead of yelling at Ryan "watch out" two or three times and trying to push him off the track, the Mexican should have done one or both of the other possible things available to have saved him, either used the angle cock or signaled the engineer to stop the engine. In order to find him negligent in these particulars, or either of them, we must recognize the emergency in which he was acting. The engine was moving at the rate of six to ten miles an hour. He did not see Ryan until he was stepping between the rails only six or eight feet in front of the engine. The evidence is that after he stepped between the rails he took one step south before he was hit. The Mexican was asked why he didn't apply the emergency brake (the angle cock) or signal the engineer, and his answer was, "Because I didn't have time."

He may have employed the wrong means to avoid the injury, but if he had attempted to use either of the other means it might have been unsuccessful and the censure could with equal force have been applied to him for failing to hurriedly push him off the track. Negligence cannot be predicated upon the choice of the wrong means pursued to avoid the injury in an emergency.

In the case of *Clark v. Atchison, T. & S. F. Rly. Co.*, 127 Kan. 1, 272 Pac. 128, the engineer, when he saw a team approaching a crossing only about 300 feet away when the train was moving at the rate of twenty miles an hour, blew the whistle, thinking the driver could divert the team in time to avoid a collision, and the court held he and the company could not be held to be negligent because he did not apply the emergency brakes before blowing the whistle. In the opinion it was said:

"If the engineer had applied the brakes before sounding the warning and a collision had occurred, the defendant might have plausibly contended that if the warning signal had been first given he could have turned aside and have saved himself and his property. There was only a moment for the engineer to consider which was the more prudent course for him to pursue, or, for that matter, for the plaintiff to consider and decide whether to stop, turn aside or drive on. It is well established that a person suddenly confronted with impending danger, without time for deliberation as to which one of two or more acts will be wisest and best, who acts in good faith and takes an action that turns out not to have been the most judicious, cannot be charged with negligence. (*Barnhart v. Glycerin Co.,* 113 Kan. 136, 213 Pac. 663.)

"In the circumstances of the case it cannot well be said that the engineer chose the wrong means to avoid the collision, and at any rate negligence in this emergency cannot be predicated upon the one chosen by the engineer." (pp. 4, 5.)

Two special matters urged by the appellee deserve attention: one is the conclusion reached in the argument by adding together three distances named by witnesses, which makes the deceased necessarily to have walked or run down between the rails in front of the engine several feet, which, according to the total of those figures, gave longer time for the Mexican to act. Against this, all three eyewitnesses said he stepped between the rails and took another step south, moving across instead of along the track. It is more reasonable to conclude the mistake may be in the distances given by the witnesses. The other matter is the answer given by Holdaway as to the Mexican on the footboard being a lookout. The answer of the engineer to that effect would not make or change the legal liability of the railway company. If there is no legal obligation on the part of the company to furnish such a lookout, as appellee implies the Mexican to have been from such answer, the answer will certainly not control or create such an obligation. Of course, in one sense of the word, all employees are lookouts, prompted to be such by natural impulses, but here we are thinking of that which carries with it a financial and legal obligation.

It is not seriously contended that the doctrine of last clear chance applies. We think it does not apply, as was held in the Clark case, *supra,* where the negligence of the plaintiff continued to the time of the collision.

Our conclusion in this case is like it was in the Caples case, *supra,* that while the jury found the deceased was in this case guilty of contributory negligence, we need not emphasize that feature but place

our decision upon the ground that it was not shown that the injury received by him was the result of any negligence of the defendant.

The judgment is reversed and the cause is remanded with instructions to render judgment for the defendant for costs.